# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
June 30, 2015 Session

## SHARON LYNNETTE HOWARD v. RANDALL LYNN HOWARD

**Appeal from the Circuit Court for Bradley County**
**No. V-14-034     Lawrence Howard Puckett, Judge**

---

**No. E2014-01991-COA-R3-CV-FILED-OCTOBER 29, 2015**

---

In this divorce action involving the dissolution of a marriage of relatively short duration, the husband appeals the trial court's distribution of the marital estate, particularly the award of the marital residence and a 1969 Ford Mustang automobile to the wife. In order to more nearly return the parties to the positions they were in prior to the marriage, we modify the distribution of the marital estate to award the 1969 Ford Mustang automobile to the husband. We also modify the trial court's judgment concerning the marital residence to extend the wife's deadline for refinancing the debts associated with the marital residence to one year following the issuance of mandate by this Court. We affirm the trial court's judgment in all other respects.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and JOHN W. MCCLARTY, J., joined.

Joshua H. Jenne, Cleveland, Tennessee, for the appellant, Randall Lynn Howard.

Philip M. Jacobs, Cleveland, Tennessee, for the appellee, Sharon Lynnette Howard.

## OPINION

### I. Factual and Procedural Background

The plaintiff, Sharon Lynnette Howard ("Wife") and the defendant, Randall Lynn Howard ("Husband") were married on March 11, 2011, and remained married slightly less than three years. At the time of trial, Husband was fifty-five years old while Wife was forty-nine years of age. Husband had been married three times before this marriage, and Wife had been married twice before. No children were born to this marriage,

although Wife did have custody of her grandson, who was eleven years old at the time of trial. Husband enjoyed fifty-percent co-parenting time with his minor son. No issues have been raised on appeal regarding the co-parenting of these minor children.

Husband was a long-time employee of the Chattanooga Gas Company, earning approximately $100,000.00 per year in that capacity throughout the marriage. According to Husband, his net income was approximately $6,000.00 per month. At the time of the marriage, Wife was employed at Athens Federal Bank. During the summer of 2011, Wife was not employed outside the home but received unemployment benefits for several months. She subsequently secured a position at Andrew Johnson Bank as a mortgage broker and continued as such throughout the instant proceedings in this action. Wife thereafter earned a yearly salary of $45,000.00 to $50,000.00. Her net monthly income at the time of trial was approximately $3,122.00.

On January 15, 2014, Wife filed a complaint for divorce, alleging irreconcilable differences or, in the alternative, inappropriate marital conduct. In response, Husband filed an answer on June 3, 2014, admitting the ground of irreconcilable differences. Although the parties participated in mediation, they were unable to resolve their differences. Following a bench trial spanning the course of two days on August 21 and 22, 2014, the court granted the parties a divorce on stipulated grounds pursuant to Tennessee Code Annotated § 36-4-129 (2014) and distributed the marital estate. The court entered a final decree on October 10, 2014. Husband timely appealed.

Although distribution of the entire marital estate is at issue on appeal, the property most central to the parties' dispute is the marital residence. All real property involved in this action is located in Cleveland, Tennessee. Prior to the marriage, Husband resided with his son in a house located on 56th Street ("the 56th Street Property"), which he co-owned with his second wife, with whom he was still finalizing a divorce settlement. Wife and her grandson resided in a home located on Jackson Drive ("Jackson Drive Property"), which was titled solely in Wife's name. The parties' courtship continued for approximately two months prior to their marriage.

On February 10, 2011, Husband entered into a contract to purchase a 4.88-acre tract of real property and home located at 2993 Benton Pike, which eventually became the parties' marital residence ("Marital Residence"). Although this property had once been part of Husband's family's farm, title had been transferred several years before. In turn, the residence on the property was built by subsequent owners. At the time of the marriage, Husband owned separately two nearby tracts of unimproved real property on Benton Pike, consisting of fifteen acres and five acres respectively. Pursuant to the February 2011 contract, Husband was to pay the amount of $290,000.00 to purchase the Marital Residence. He entered into the contract with the sellers in his name only. Upon

2

withdrawing $76,000.00 from his 401(k), Husband tendered a $60,000.00 down payment in February 2011 in furtherance of the contract.

The Marital Residence sustained significant tornado damage in April 2011. The sellers, upon discovering that their homeowners' insurance did not cover the damage, renegotiated the purchase and sale contract, this time contractually obligating Wife as well as Husband. On August 8, 2011, the parties entered into a second purchase and sale contract with the sellers, agreeing on a reduced purchase price of $190,000.00 with the $60,000.00 previously paid by Husband to be treated as a down payment. On August 31, 2011, the sellers executed a warranty deed conveying title to the property to Husband and Wife as tenants by the entirety. Following the transfer of ownership, the parties, together with Wife's grandson and Husband's son, moved into the Marital Residence.

Concomitantly with their purchase of the Marital Residence, the parties entered into a mortgage loan agreement with Athens Federal Community Bank in the amount of $188,000.00. After paying costs and the sellers' purchase price, the parties retained approximately $58,000.00 for the purpose of making construction repairs to the Marital Residence. Although the repairs were in fact made, the parties both assert that a portion of these funds was spent to pay other expenses. Wife testified that Husband insisted on paying cash to contractors and repairmen, which made tracing expenditures difficult. The parties refinanced the mortgage on the Marital Residence again in December 2011, resulting in a principal loan balance at that time of $184,000.00. On August 1, 2012, a home equity line of credit ("HELOC") was also acquired by the parties, secured by title to the Marital Residence, in the amount of $38,811.00. Although it is undisputed that Wife used $27,000.00 of the funds obtained through the HELOC to pay credit card debt in her name, Wife explained that she had used her credit card to help support the family.

During the marriage, Wife's elderly mother and uncle ("Uncle") both came to reside with the parties at the Marital Residence. Further complicating the parties' financial environment, Uncle had conveyed title to his home to Wife approximately seven years prior to the parties' marriage. By such transfer, Uncle retained a life estate in his home. According to Wife, when it became clear that Uncle could no longer live independently, she sold the residence and applied the proceeds to convert a barn at the Marital Residence into a living space for Uncle. Wife sold Uncle's home for $45,000.00 in September 2012. Wife maintained that a significant portion of this amount was committed to renovating the barn and making other needed property repairs at the Marital Residence. In addition, Wife testified that she also withdrew approximately $11,000.00 of Uncle's funds over which she had control and contributed a portion of those funds to renovation of the barn and marital expenses.

3

Wife's mother moved into the Marital Residence after she experienced a health crisis in June 2012. It is undisputed that Wife's mother owned a home, unencumbered by debt, across the street from the Jackson Drive Property. Wife's mother's home was not inhabited at the time of trial, and Wife suggested that it would require extensive repairs to become habitable.

The trial court in its final judgment, *inter alia*, awarded to Wife the Marital Residence and the Jackson Drive Property, as well as attributing to Wife the debt relative to each. Regarding the debt associated with the Marital Residence, the court directed that Wife would be required to refinance both the first mortgage and the HELOC in her name by August 21, 2015, one year following the first day of trial. The court awarded to Husband the 56th Street Property and the fifteen-acre and five-acre unimproved Benton Pike properties. Husband demonstrated that he had entered into a contract to sell the 56th Street Property during the pendency of the divorce and had received a $20,000.00 nonrefundable deposit from the proposed buyers on February 3, 2014. Upon agreement of the parties, the court divided equally the funds in Husband's 401(k) account that had accrued during the marriage. Ultimately, the court divided the marital estate by awarding Wife approximately 60.9% and Husband approximately 39.1%, concluding that the division was an equitable distribution. Husband timely appealed.

## II. Issues Presented

Husband presents four issues on appeal, which we have restated slightly as follows:

1. Whether the trial court erred by failing to follow the holding of *Batson v. Batson*, 769 S.W.2d 849, 859 (Tenn. Ct. App. 1988), regarding the distribution of marital assets concerning marriages of relatively short duration.

2. Whether the trial court erred by failing to follow the holding of *Brock v. Brock*, 941 S.W.2d 896 (Tenn. Ct. App. 1996), and *Flannary v. Flannary*, 121 S.W.3d 647 (Tenn. 2003), in granting "credits" to Wife for property or "funds" not in existence and not subject to division at the time of the divorce.

3. Whether the trial court erred by failing to properly consider the relative economic contributions made by each party to the marriage.

4. Whether the trial court erred by failing to equitably divide the marital estate.

4

III. Standard of Review

In a case involving the proper classification and distribution of assets incident to a divorce, our Supreme Court has elucidated the applicable standard of appellate review as follows:

> This Court gives great weight to the decisions of the trial court in dividing marital assets and "we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures." *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996). As such, when dealing with the trial court's findings of fact, we review the record de novo with a presumption of correctness, and we must honor those findings unless there is evidence which preponderates to the contrary. Tenn R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). Consequently, where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). The trial court's conclusions of law, however, are accorded no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

*Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007). Questions relating to the classification of assets as marital or separate are questions of fact. *Bilyeu v. Bilyeu*, 196 S.W.3d 131, 135 (Tenn. Ct. App. 2005).

Further, as this Court has previously held:

> Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate property or marital property before equitably dividing the marital estate. Separate property is not subject to division. In contrast, Tenn. Code Ann. § 36-4-121(c) outlines the relevant factors that a court must consider when equitably dividing the marital property without regard to fault on the part of

5

either party. An equitable division of marital property is not necessarily an equal division, and § 36-4-121(a)(1) only requires an *equitable* division.

*McHugh v. McHugh*, No. E2009-01391-COA-R3-CV, 2010 WL 1526140 at *3-4 (Tenn. Ct. App. Apr. 16, 2010) (internal citations omitted) (emphasis in original). *See also Manis v. Manis*, 49 S.W.3d 295, 306 (Tenn. Ct. App. 2001) (holding that appellate courts reviewing a distribution of marital property "ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c) or is not supported by a preponderance of the evidence.").

## IV. Equitable Distribution of Marital Estate

All of the issues raised by Husband on appeal relate to the trial court's overall distribution of the marital estate. In contending that the trial court failed to equitably distribute the estate, Husband argues that the court erred by (1) granting "credit" to Wife for property or funds not in existence at the time of the divorce judgment; (2) failing to properly consider the relative economic contributions to the marriage made by each party; and (3) failing to leave these parties to a short-term marriage in, as nearly as possible, the same respective positions they would have been in had the marriage never taken place, pursuant to *Batson*, 769 S.W.2d at 859. Having thoroughly reviewed the evidence, we conclude that in order to place the parties more nearly in the same respective positions they would have been in without this marriage, the trial court's distributions should be modified slightly by the award of one item, a 1969 Ford Mustang convertible automobile ("the Mustang"), to Husband rather than to Wife. We determine the trial court's overall distribution of the marital estate to be equitable in all other respects.

Tennessee Code Annotated § 36-4-121(c) (Supp. 2015) provides the following factors as guidance for determining an equitable division of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

6

(5)(A) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(B) For purposes of this subdivision (c)(5), dissipation of assets means wasteful expenditures which reduce the marital property available for equitable distributions and which are made for a purpose contrary to the marriage either before or after a complaint for divorce or legal separation has been filed.

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

In the instant action, the parties do not dispute the trial court's determination as to the classification of separate property owned by each party. Regarding marital property, however, Husband essentially asserts that the trial court's distribution of the marital estate would have been equitable had he been awarded three additional items that he had proposed at trial: the Marital Residence (with associated debts), the Mustang, and a zero-turn lawn mower (with associated debt). The trial court awarded the three items to Wife and assigned the debts associated with the Marital Residence and the zero-turn lawn mower to her. Although the trial court awarded the Mustang to Wife, the court obligated Husband with the debt concerning the Mustang.

The parties stipulated to the value of the Marital Residence in the amount of $265,000.00. As also stipulated, the principal balance remaining on the subject mortgage

at the time of trial was $173,000.00. The balance remaining on the HELOC was $40,000.00. The trial court in its final judgment therefore determined the parties' combined equity in the Marital Residence to be $52,000.00. The court valued, without dispute, the Mustang at $10,000.00. Related to the Mustang, Husband testified that he owed a balance of approximately $7,000.00 through a loan he obtained against his 401(k). Although the agreed value of the zero-turn lawn mower was $3,000.00, the agreed debt owed against the item was also $3,000.00, yielding a net value of $0.00. Noting that Husband has been assigned payment of the debt associated with the Mustang in the final judgment, we determine that the total value of the three items Husband requests this Court award to him in order to establish a purportedly equitable distribution is $62,000.00.

Each party has, respectively, submitted a table pursuant to Tennessee Court of Appeals Rule 7, "list[ing] all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts." *See* Tenn. Ct. App. R. 7(a). The parties differ slightly in their valuation calculations of the total marital estate as considered by the trial court.[1] According to Wife's Rule 7 table, the trial court valued the total net marital estate at $179,748.72. Wife calculated that the trial court awarded net marital assets to Wife in the amount of $105,333.86 and net marital assets to Husband in the amount of $74,414.86, for a respective net distribution of 58.6% to Wife and 41.4% to Husband. According to Husband's Rule 7 table, the trial court valued the total net marital estate at the slightly lower figure of $176,359.31. Husband calculated that the court awarded net marital assets to Wife in the amount of $107,414.00 and net marital assets to Husband in the amount of $68,945.31, for a respective net distribution of 60.9% to Wife and 39.1% to Husband.

The trial court made the following specific findings of fact, in pertinent part, regarding the overall distribution of marital property and the effect of the award to Wife of the Marital Residence on that distribution:

> If you review the Husband's proposed distribution of assets and he is awarded the real property on Benton Pike then Husband would be awarded $127,496.00 of net assets and Wife would receive $49,183.86 of net assets. This is not an equitable distribution of the assets under these circumstances. The Court does not necessarily like the result and if there was a better way, then the Court would order it as such, but it is necessary to be fair to the Wife. Based on exhibit 41 which was submitted by the Wife as argument Husband would come out with a before/after change of $65,000 and the Wife would only have a before and after change of $4,700.00. The Court

---

[1] No issues regarding valuation have been raised by the parties on appeal.

has analyzed the contribution of the parties and believes that it is most equitable to award the residence on Benton Pike to the Wife. The Court tracks the Wife's proposed distribution but there will be no cash settlement of $29,000.00 as requested by Wife. Otherwise the Court tracks Wife's proposed distribution and finds this puts her back where she would have been but for the marriage.

We note that in referencing the net assets above, the trial court found the total to be $176,679.86, or closest to the calculation provided by Husband's Rule 7 table at $320.55 more than the total according to Husband.

For the trial court, determining the total value of the marital estate involved focusing upon a moving target throughout the proceedings, in part because Husband bought, repaired, and sold numerous vehicles as a hobby and was awarded several used vehicles in various stages of repair both as his separate property and as part of his portion of the marital estate. In addition, the parties maintained several bank accounts, borrowing and transferring funds frequently to remain current in payment of living expenses and construction and repair costs to the Marital Residence. Costs associated with their other real properties and vehicles accrued as well. Rather than analyzing the parties' calculations line by line in this regard, we will assume, *arguendo*, for the purpose of addressing Husband's issues presented on appeal that the total net assets he was awarded equaled 39.1% of the marital estate. Using Husband's calculations as presented in his Rule 7 table and the undisputed values of the equity in the Marital Residence ($52,000.00), the marketable value of the 1969 Mustang ($10,000.00), and the net value of the zero-turn lawn mower ($00.00), Husband is requesting that this Court determine that he should be awarded total net assets in the amount of $130,945.31, or 74.2% of the amount he proffers as the net value of the marital estate. We agree with the trial court that such a disproportionate distribution of the marital estate would not be equitable. We will address each of Husband's arguments in turn.

A. Wife's Contributions of Premarital Separate Property

Husband contends that the trial court erred by granting "credits" to Wife for financial contributions to the marriage that no longer existed at the time of trial. Specifically Husband argues that the court erred by crediting Wife with the following: (1) a ten-percent tax penalty, in the amount of $7,600.00, paid after the parties were married on Husband's premarital 401(k) withdrawal; (2) a net withdrawal in the amount of $22,260.00 taken during the marriage from Wife's 401(k); (3) $45,000.00 in proceeds obtained from the sale of Uncle's home; (4) $11,000.00 from Uncle's bank account; and (5) $10,553.00 in Wife's individual bank account at the time of the marriage. Wife responds that the trial court properly considered her individual assets contributed to the

marriage. The trial court also credited Wife's testimony that she had contributed to the marriage $9,000.00 received from an insurance settlement concerning April 2011 tornado damage to the Jackson Drive Property, $5,000.00 received from the sale of her individual stock owned prior to the marriage, and $3,500.00 from the settlement of a lawsuit regarding unpaid wages due from her former employer. We conclude that the evidence does not preponderate against the trial court's consideration of Wife's financial contributions of her separate property to the marital estate.

In support of his contention, Husband relies on our Supreme Court's decision in *Flannary*, 121 S.W.3d 647, and this Court's earlier decision in *Brock*, 941 S.W.2d 896.

In particular, this Court held in *Brock*:

[P]roperty once owned by a spouse, either as separate property or marital property, but not owned by either spouse at the time of the divorce, is not subject to classification and division or distribution when the divorce is pronounced. This is because, generally speaking, a court cannot divide and/or distribute what is "not there"–property no longer owned by the parties, individually or jointly, at the time of the divorce.

941 S.W.2d at 900.

Similarly, our Supreme Court subsequently held in *Flannary* that funds missing at the time of the divorce cannot be subject to division as "marital property" pursuant to "the definition found at Tennessee Code Annotated section 36-4-121(b)(1)(A)." *Flannary*, 121 S.W.3d at 650 (citing *Brock*, 941 S.W.2d at 900 with approval).

In its final judgment, the trial court explicitly considered the Tennessee Code Annotated § 36-4-121(c) factors in determining its distribution of the marital estate. The court's findings regarding Wife's contributions to the marital estate were made within the context of its consideration of factor (5)(A), the "contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property . . . ." *See* Tenn. Code Ann. § 36-4-121(c). The court stated in relevant part:

Each party's contributions to the acquisition of marital assets is the most significant factor in this case for determining the division of assets. The Court has measured which party came out ahead or behind based on their contribution. The Husband liquidated $76,000.00 from his 401K to net . . . $60,000.00 for the down payment to the purchase [of] the marital residence prior to the marriage; however, the $7,600 in tax penalties that

resulted from the cash out that the parties had to absorb when filing their joint tax return following their marriage. The Court credits the Wife's testimony that an additional $7,600.00 had to be paid as an early withdrawal penalty as reflected on exhibit 25.

The Court credits the Wife's testimony that she drew down $22,260 from her retirement. She tracked the contribution through exhibits 8, 9, 10, 11 and 12, and the Court credits that testimony and that $5,000 of same was paid into the construction loan account. The Wife contributed $45,000 from the sale of her Uncle's residence as indicated in exhibit 16. The Wife also had $10,559.06 in her bank account at the time of the marriage, according to Exhibit 19.[2] The Court finds that Wife paid $5,500 and $9,000 to fix up the barn according to exhibit 17. Exhibit 15 shows Wife paying $2,425 and $923.20 from her Tennessee Valley Credit Union account to Cleveland Plywood and Wholesale Supply.

The third fund at issue is the HELOC the parties obtained in the amount of $38,811.00. From this amount, $11,500 went directly to the Husband for whatever purpose; $15,517.00 went to pay off the Wife's pre-marital credit card, $1,000 went to Husband's ex-wife and $1,855.00 went to the IRS. $574.00 was also paid to Farm Bureau to total $13,259.00 from the HELOC.

The Wife contributed $10,559.00 from the $45,000 obtained by Wife upon the sale of her uncle's home.

The fourth fund was the $10,553.00 Wife had in her bank account at the time of marriage.

The fifth fund is an additional $11,000.00 from Wife's uncle's money.

The Wife also contributed an additional $9,000 from tornado insurance money as shown on exhibit 23.

---

[2] Trial exhibit 19 is the settlement statement related to the parties' refinancing of the Jackson Drive Property. Wife testified that she used $10,559.06 of the $45,000.00 received from the sale of Uncle's home to pay the closing costs related to the refinancing. Wife presented the balance in her bank account at the time of the marriage through trial exhibit 22, which showed a balance of $10,053.26. In a subsequent paragraph of the judgment, the trial court notes this balance as $10,553.00. These apparent typographical errors do not significantly affect the amounts of these contributions considered by the trial court and therefore do not affect our analysis.

The money from Wife's uncle was a gift to Wife but was then put into the marriage by Wife and merged as a marital asset and distributed throughout the marital estate.

(Paragraph numbering omitted.)

Specifically as to Husband's argument, the trial court found that Husband's premarital withdrawal of $76,000.00 from his 401(k) resulted in a $60,000.00 contribution of his separate property when he paid $60,000.00 in earnest money to enter a purchase and sale contract for the Marital Residence. The remaining $16,000.00 of that withdrawal was withheld by Merrill Lynch, the 401(k) holder, for taxes and penalties. It was undisputed that the parties had to pay an additional ten-percent tax penalty related to Husband's 401(k) withdrawal when they filed their 2011 joint federal tax return. Wife presented two checks written to the Internal Revenue Service on her individual bank account, one in the amount of $3,000.00 dated July 10, 2012, and one in the amount of $1,895.22, dated August 2, 2012, demonstrating that she had paid at least a portion of the tax owed from her account. Husband testified that he paid the remaining balance of the 2011 federal income taxes owed when he sold two vehicles. Wife also explained, however, that in general, Husband preferred to deal in cash while she preferred to deposit any funds obtained in her checking account and write checks. Testimony presented by both Husband and Wife established that early in the marriage, withdrawals and deposits began crossing, with Wife often giving Husband cash or receiving cash from Husband. Wife was the party who generally wrote checks when such instruments were required to pay bills. Contrary to Husband's argument, the trial court did not find that Wife had paid the $7,600.00 tax penalty out of her separate funds or "credit" her with the penalty paid. The court found in its judgment that Husband's separate contribution from the 401(k) was reduced by both parties' shared responsibility to pay the tax penalty related to their 2011 joint federal return.

As to the net $22,260.00 that Wife withdrew during the marriage from her 401(k) and the $45,000.00 in proceeds Wife received from the sale of Uncle's home (titled in Wife's name at the time of the marriage), Husband does not dispute that these did in fact originally represent Wife's separate property. Husband does argue that Wife presented insufficient evidence to support the trial court's conclusion that Wife contributed a gift from Uncle in the amount of $11,000.00 to the marital estate. Wife presented a statement of deposits to her individual savings account, payable on death to her mother, and testified that an $11,000.00 deposit made in July 2013 constituted a transfer from Uncle's checking account. According to Wife, Uncle requested that she move the $11,000.00 into her savings account. When questioned regarding what she had done with the $11,000.00 deposit, Wife responded: "Paid bills. And part of it – part of it is still there,

and part of it I've transferred to survive on, once again.  But part of it still remains there."  Considering the totality of the testimony and other evidence presented at trial regarding the parties' respective practices of Husband's dealing in cash and Wife's depositing funds and writing checks to pay marital expenses, the trial court credited Wife's testimony that this deposit had been primarily disbursed into the marital estate.  We note also that no dispute existed regarding the caretaking relationship of the parties toward Uncle, who resided in the remodeled barn at the Marital Residence.

The trial court also found that Wife had contributed the balance of $10,053.26 reflected in her individual bank account for the period ending December 31, 2010.  Husband argues that Wife failed to present proof that this balance remained in her account on March 11, 2011, when the parties were married.  He notes that Wife acknowledged proceeding with a $10,000.00 pre-planned, elective surgery on March 18, 2011.  Wife, however, explained that she paid for her surgery through a separate loan against her 401(k) fund.  The trial court credited Wife's testimony in this regard, and Husband presented no evidence to the contrary.  We emphasize that "[W]here issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings."  *See Keyt*, 244 S.W.3d at 327.

In contrast to Husband's argument, our review of the trial court's judgment and the record as a whole reveals that the court considered monies that Wife had obtained through withdrawing her premarital separate funds or liquidating her premarital separate property as contributions to the marital estate, pursuant to Tennessee Code Annotated § 36-4-121(c)(5)(A).  At no time did the court engage in a dollar-for-dollar "credit" to Wife of separate property for the funds she had contributed to the marriage.  *See Brock*, 941 S.W.2d at 900 ("In other words, the property owned at the time of the marriage does not come into play as a 'classification' matter, but rather as a factor to be considered in dividing marital property.").  Moreover, although Husband repeatedly argues that contributions made by Wife no longer existed at the time of the divorce if corresponding marital debt was still owed, his argument in this regard is unavailing.[3]  As Wife notes, although the parties accumulated a significant amount of marital debt during their marriage, their debt would have been larger if not for Wife's contribution of her separate, premarital assets.  Husband is not entitled to relief on this issue.

---

[3] Contrary to Husband's characterization of the trial court's findings regarding the HELOC obtained by the parties, we determine, upon our review of the judgment and the court's remarks at close of trial, that the court examined the evidence to trace how the parties had spent the funds obtained through the HELOC rather than considering the HELOC funds a contribution to the marital estate made by either party.

## B. Relative Economic Contributions of the Parties

We next address the closely related issue of whether the trial court properly considered the parties' relative economic contributions pursuant to Tennessee Code Annotated § 36-4-121(c)(5)(A). In addition to his argument, addressed above, that the trial court improperly considered Wife's contributions of what had been her separate property, Husband argues in particular that the trial court failed to properly weigh his (1) contribution to Wife's retained rental income from the Jackson Drive Property, (2) separate and initial contribution in the amount of $60,000.00 to the purchase of the Marital Residence, (3) contribution of rental income earned from the 56th Street Property, and (4) contribution of a $20,000.00 nonrefundable down payment he received from prospective buyers of the 56th Street Property. In response, Wife asserts that the trial court properly considered the parties' relative economic contributions. Upon our thorough review, we agree with Wife on this issue. We will address each of Husband's claimed contributions in turn.

First, Husband argues that due to the marriage, Wife was able to move out of the Jackson Drive Property and thereby earn rental income that she would not have been able to earn if Husband had not contributed to her living expenses. As Wife asserts, this argument ignores the fact that the rental income from the Jackson Drive Property barely covered the mortgage and expenses the parties paid related to the property. Wife testified that tenants, who had resided at the Jackson Drive Property throughout the parties' marriage, paid $650.00 monthly in rent. Wife further explained that the corresponding mortgage payment was $555.00 monthly and that when combined with other expenses related to the property, she paid $598.00 per month, not including any repairs needed on the home. The parties refinanced the mortgage on the Jackson Drive Property once during the marriage. Wife presented a settlement statement demonstrating the parties paid $10,559.00 in costs for this refinancing. The settlement statement reflects the "borrowers" as "Randy Howard and wife, Sharon Howard." According to Wife, Husband's name was placed on the deed at the time of refinancing.[4] Husband does not refute Wife's testimony that the $10,559.00 paid to refinance the mortgage on the Jackson Drive Property originated with the sale of Uncle's home and thus was derived from Wife's separate, premarital property. The trial court did not err by declining to consider any nominal income earned from the Jackson Drive Property as a contribution somehow made through Husband's separate property.

Second, as noted above, the trial court considered Husband's contribution of $60,000.00 from his premarital retirement 401(k) fund toward the purchase of the Marital

---

[4] It is not clear from the record on appeal whether upon refinancing, the parties owned the Jackson Drive Property as tenants in common or tenants by the entirety.

Residence while also considering that the remaining $7,600.00 federal tax penalty became a marital debt paid by the parties during the marriage. Husband does not dispute that the Marital Residence became marital property through the course of the marriage. Husband does assert that in paying the $60,000.00 earnest money on the purchase and sale contract in February 2011, he became the owner of the Marital Residence as his separate property prior to the marriage. The trial court, however, found that the parties purchased the Marital Residence following their renegotiation of the purchase and sale contract with the property's sellers in August 2011, wherein the $60,000.00 previously paid by Husband was treated as a down payment. It is undisputed that title to the Marital Residence was transferred via warranty deed by the sellers to Husband and Wife as tenants by the entirety on August 31, 2011. At no time was title transferred to Husband individually. Wife does not dispute that the marital debt associated with the Marital Residence would be greater if Husband had not contributed the original $60,000.00 down payment. The evidence does not preponderate against the trial court's finding that the equity in the Marital Residence was marital property with consideration given to Husband for the separate funds he originally contributed to provide the down payment.

Third, Husband argues that the trial court failed to consider rental income received from the 56th Street Property during the marriage. It is undisputed that tenants leased the 56th Street Property for a period of time during the marriage and that the parties received the rental income. Wife testified that certain $2,000.00 deposits made into the account she accessed for marital funds were received as monthly lease payments from the tenants of the 56th Street Property. Husband stated that tenants paid $1,500.00 in monthly rent. The discrepancy between these amounts is explained somewhat by Wife's presentation of an "Addendum to Purchase Agreement," dated February 3, 2014, entered into by Husband and proposed buyers of the 56th Street Property. The addendum set forth that the buyers, who were the current tenants on the property, would pay $1,500.00 in monthly rent through December 31, 2014, and $1,750.00 in monthly rent thereafter, pending closing of the sale. Regarding any alleged profit from the rental income, Wife testified that the parties paid approximately $1,700.00 in payments on a mortgage held by Wells Fargo on the 56th Street Property. Wife also testified that the property was not occupied by tenants at all times during the marriage. Husband did not refute Wife's testimony in this regard. The proof concerning a variable amount of rent, taken together with the parties' payment of insurance and taxes on the property, does not preponderate in favor of a finding that rental income from the 56th Street Property was any more than a nominal contribution to the marital estate at best.

Finally, as a result of his purchase agreement with the 56th Street Property's prospective buyers, Husband received on February 3, 2014, during the pendency of the divorce proceedings, a nonrefundable down payment in the amount of $20,000.00. The trial court accepted the parties' stipulated valuation of the 56th Street Property at

$260,000.00. The court stated in its final judgment that it had "identified the separate property reflected in the Master Asset List submitted as Trial Exhibit 1." According to the master asset list, the status of the 56th Street Property as separate or marital property was disputed by the parties at the outset of trial. However, each party has respectively listed the 56th Street Property as Husband's separate property in his or her Rule 7 table on appeal. We therefore determine that the trial court classified the 56th Street Property as Husband's separate property and that any debt still associated with that property was Husband's sole responsibility prior to the distribution of marital assets and liabilities.[5]

Husband indicated at trial that although the 56th Street Property was still titled solely in the name of his second wife, Kim Beasley, he was authorized to sell the property. He testified that at the time he married Wife, he owed Ms. Beasley $7,000.00 to complete the settlement of their divorce proceeding. Husband and Wife paid the $7,000.00 debt to Ms. Beasley during their marriage, and Husband acknowledged that Wife paid approximately $1,000.00 from her personal account toward the debt. According to Husband, he was then entitled through his former divorce settlement to refinance the 56th Street Property in his name, but the refinancing costs were prohibitive. It is undisputed that upon receiving the $20,000.00 in February 2014, Husband gave $5,000.00 to Wife.

The parties differed in their accounts of why Husband gave Wife the $5,000.00 in February 2014. This provides an illustrative example of the challenge confronting the trial court in tracing the parties' individual economic contributions to the marriage. Husband related that he tendered Wife the $5,000.00 in order to pay off the remainder of a $6,000 short-term loan Wife previously had acquired on his behalf during the marriage. The exact date of this short-term loan is not clear from the record, but it is undisputed that at some point following the parties' marriage and before the sale of Uncle's home in September 2012, Wife obtained a short-term bank loan in the amount of $6,000.00 and transferred the proceeds to Husband. Wife maintained that Husband requested the loan to buy an Oldsmobile Cutlass automobile. Husband denied that he purchased an Oldsmobile Cutlass with the $6,000.00, insisting that both of the Oldsmobile Cutlass automobiles identified on his asset list were purchased prior to the marriage. When questioned regarding why he needed Wife to obtain the $6,000.00 loan, Husband responded as follows:

> I don't remember what I had got the money for but I got it. And I remember she told me that it was due so I gave her some cash. I don't even

---

[5] Although testimony demonstrated that the parties had tendered payments on a mortgage associated with the 56th Street Property and held by Wells Fargo Bank, the amount of the outstanding debt owed related to said mortgage appears in the appellate record only on Wife's proposed distribution submitted to the trial court as an exhibit. This exhibit showed the mortgage balance as $240,000.00.

remember what I gave her. I was thinking I gave her $2,000. I'd sold something. I gave her some cash to renew it and pay down on it and then I told her whenever I got that house up there sold or got some money on it I'd pay that note off.

In contrast, Wife testified that she had paid the balance of the $6,000.00 short-term loan with a portion of the $45,000.00 received from the sale of Uncle's home. She maintained that the $5,000.00 Husband provided her in February 2014 was intended to repay her for those months when she had made payments on and contributed to maintenance of the 56th Street Property.

Regarding the balance of the $20,000.00 Husband received in February 2014, he explained:

Well, I paid our car insurance. Her car insurance, my car insurance, home insurance. I paid $6,500 I think to Bank of Cleveland. I just paid miscellaneous stuff. I mean, it was my money to pay bills and I just paid some stuff that I owed. I still owed a couple that had worked on my other barn and stuff and I just paid them.

We note that upon the close of trial, Husband acknowledged a debt to the Bank of Cleveland as his separate debt. Husband did not specify whether the "home insurance" referenced was associated with the Marital Residence or his separate 56th Street Property. The record contains no further explanation of the work Husband hired accomplished on his "other barn," presumably a different barn than the one remodeled by the parties as a home at the Marital Residence for Uncle. Although, arguably, some portion of the insurance and other expenses Husband paid in February 2014 with these funds may have constituted marital debt, Husband presented no proof to this effect. We conclude that the trial court did not err by declining to consider the $20,000.00 down payment received by Husband for sale of the 56th Street Property as a contribution to the parties' marital estate.

C. Marriage of Relatively Short Duration

Husband contends that although the trial court in its analysis correctly found the parties' marriage to be a short-term one and thus concluded *Batson*, 769 S.W.2d 849, to be a controlling authority, the court failed to follow the "mandate" of that decision in that Wife emerged from the divorce judgment in a comparatively more favorable position than did Husband. Wife asserts that in making this argument, Husband has relied on a mischaracterization of the Marital Residence as Husband's separate property prior to the marriage and has failed to fully consider the separate property held by Wife prior to the

17

marriage. Recognizing that a full return of either party to his or her respective premarital financial status is not practicable in this situation, we conclude that the sole modification required to more equitably return the parties to the positions they would have been in if not for the marriage is to award the Mustang to Husband rather than Wife.

Regarding the effect of a short-term marriage on the equitable distribution of a marital estate, this Court held in *Batson*:

> Tenn. Code Ann. § 36-4-121(c)(1) permits trial courts to consider the duration of the marriage. In cases involving a marriage of relatively short duration, it is appropriate to divide the property in a way that, as nearly as possible, places the parties in the same position they would have been in had the marriage never taken place.

769 S.W.2d at 859. In characterizing this holding from *Batson* as a "mandate," Husband fails to place the holding in the context of other statutory factors to be considered by the trial court. *See* Tenn. Code Ann. § 36-4-121(c). As this Court recently explained:

> *Batson* was a divorce case involving parties who were married a little more than five years prior to their separation. In discussing the division of marital property we noted:
>
> > A trial court's division of marital property is to be guided by the factors contained in Tenn. Code Ann. § 36-4-121(c). However, an equitable property division is not necessarily an equal one. It is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case.
>
> *Batson,* 769 S.W.2d at 859. In determining that the marital property need not be divided equally but, rather, that the parties should be restored to their "pre-marriage financial condition," we took into account a number of specific considerations in addition to the length of the marriage. We considered the fact that husband's net worth was over ten times that of his wife and his annual income was nine times larger than wife's at the time of their marriage; that the parties supported themselves during the marriage primarily on husband's income; that a large part of the marital property consisted of the increase in value of husband's retirement accounts, which would be diminished if liquidated; and that the wife's non-monetary

18

contributions were best considered as part of the award of separate maintenance and support. *Id.*

* * *

Although the duration of the marriage is listed as the first factor in Tenn. Code Ann. § 36-4-121(c), "this should not [be] interpreted to mean that this factor should always carry more weight than the others. The factors are not listed in order of importance, and each is to be considered in relation to the specific facts of each case." *Powell v. Powell,* 124 S.W.3d 100, 108 n.8 (Tenn. Ct. App. 2003).

*Bates v. Bates*, No. M2010-02590-COA-R3-CV, 2012 WL 2412447 at *4 (Tenn. Ct. App. June 26, 2012).

In the case at bar, the trial court, in addition to its consideration of the parties' respective financial contributions, delineated in its final judgment its consideration of other statutory factors as follows in pertinent part:

This is a short-term marriage and the Court will take the approach from the <u>Batson</u> case and place the parties back into the position they would have been in but for the marriage but with due regard to the equities between the parties that have been established.

The Husband has had long term employment with income over $100,000.00.

The Wife has been in the banking industry working as a Mortgage Broker having an income around $50,000.00 which is roughly half of the income of the Husband.

Neither party has any physical or mental limitations.

There have been no intangible contributions to the other party's earning capacity.

The Husband has a greater ability to acquire additional assets based on his abilities as a trader and his higher income.

(Paragraph numbering omitted.) *See* Tenn. Code Ann. § 36-4-121(c)(1) (duration of marriage), (2) (age, health, skills, employability, earning capacity, and financial liabilities

19

and needs of each party), (3) (tangible or intangible contribution by one party to the education, training, or increased earning power of the other), and (4) (the relative ability of each party to acquire future capital assets and income).

At the close of the first day of trial, the court directed each party's counsel to individually submit an analysis of the party's respective financial position prior to and subsequent to the marriage according to the submitting party's proposed distribution. The parties introduced these analyses as exhibits at the beginning of the second day of trial and were afforded an opportunity to explain them. The trial court in its final judgment accepted Wife's exhibit, as well as the proposed distribution submitted by Wife, as most nearly constituting an equitable division of the marital estate. Specifically in its final judgment, the trial court stated the following regarding the outcome if the Marital Residence were awarded to Husband pursuant to Husband's proposal:

> Based on exhibit 41 which was submitted by the Wife as argument Husband would come out with a before/after change of $65,000 and the Wife would only have a before and after change of $4,700.00. The Court has analyzed the contribution of the parties and believes that it is most equitable to award the residence on Benton Pike to the Wife. The Court tracks the Wife's proposed distribution but there will be no cash settlement of $29,000.00 as requested by Wife. Otherwise the Court tracks Wife's proposed distribution and find this puts her back where she would have been but for the marriage.

The exhibit referenced above by the trial court, Wife's calculations of each party's "Before" and "After" financial status, presents as follows:

| WIFE | BEFORE | AFTER |
|---|---|---|
| Personal Property | $   9,000,00 | $  6,650.00 |
| 401(k) | 30,000.00 | 50,000.00 |
| Cash | 10,000.00 | 0.00 |
| Stock | 5,000.00 | 0.00 |
| Real Property | 120,000.00 | 100,000.00 |
| Real Property | 45,000.00 | 265,000.00 |
| Car | 10,000.00 | 15,000.00 |
| Car | 0.00 | 10,000.00 |
| Real Property Debt | 100,000.00 | 302,000.00 |
| Car Debt | 0.00 | 15,000.00 |
| [Other] Debt | 33,000.00 | 33,943.00 |

|  | | |
|---|---|---|
| TOTAL | [$96,000.00][6] | $95,707.00 |

| HUSBAND | BEFORE | AFTER |
|---|---|---|
| Personal Property | $ 10,000.00 | $ 15,000.00 |
| 401(k) | 175,000.00 | 157,000.00 |
| Cash | 0.00 | 2,000.00 |
| Real Property (1) | 260,000.00 | 260,000.00 |
| Real Property (2) | 75,000.00 | 115,000.00 |
| Car | 29,000.00 | 46,800.00 |
| Real Property Debt (1) | 250,000.00 | 240,000.00 |
| Real Property Debt (2) | 90,000.00 | 75,000.00 |
| Credit Card | 0.00 | 5,000.00 |
| TOTAL | $209,000.00 | $275,800.00 |

(Parenthetical comment omitted.) Considering that Wife's calculations in this exhibit were admittedly approximate, upon our analysis of the parties' marital assets and individual contributions to those assets, we conclude that the trial court did not err in finding Wife's calculations to be persuasive.

In contrast, Husband contends on appeal that upon entry of the final judgment, Wife's financial status increased by "890%" from her premarital status, from an estimated net worth of $11,464.50 to an estimated net worth of $113,493.86 upon distribution of the marital estate. As Wife notes, Husband fails to include in his calculations of Wife's premarital assets Uncle's home, which yielded $45,000.00 when sold; Wife's stock owned prior to the marriage, which she sold during the marriage for $5,000.00; and Wife's jewelry, listed by both parties as her separate asset and valued at $6,000.00.

Apart from the vastly different calculations of the parties in this regard, we recognize that their financial conditions at the time of trial were such that it was impossible for the trial court to award the Marital Residence to either party without having that party benefit more financially from the marriage than the party relinquishing the Marital Residence. Upon the close of trial, the court noted that the circumstances surrounding the Marital Residence in this action were unique in part because each party had respectively requested an award of the Marital Residence despite the significant outstanding debt owed against the property. As the court found, Husband had demonstrated ancestral ties to the Marital Residence while Wife had indicated that extended members of her family had become dependent on their ability to reside at the Marital Residence during their elder years. The court did not find that sale of the Marital

---

[6] In an apparent mathematical error, Wife's exhibit listed the total as $91,000.00. Contrary to her interest in the matter, the error resulted in her submission of a higher estimated financial gain for Wife.

Residence, with a subsequent division of the equity, would benefit either party. Upon our thorough review of the record and the statutory factors, we conclude that the trial court did not err by awarding to Wife the Marital Residence as part of an equitable distribution of the marital estate.

However, in consideration of the difficulty in returning each party as closely as possible to his or her financial status prior to the marriage, *see Batson*, 769 S.W.2d at 859, we conclude that the evidence preponderates in favor of a determination that the trial court's distribution of the marital estate should be modified to award the Mustang to Husband as he has requested throughout the proceedings and on appeal. The court valued the Mustang at $10,000.00 and noted that Husband owed a debt related to its purchase against his 401(k) in the amount of approximately $7,000.00. The court attributed the related debt to Husband but awarded the Mustang to Wife. The court also awarded to Wife from the marital estate a 2010 Toyota Camry, which she testified was her primary vehicle. Although Wife requested that she be awarded the Mustang, indicating that it had been purchased for her to drive, she also acknowledged that at the time of trial, Husband had "it taken apart," apparently in the process of refurbishing it.

As we noted earlier, Husband's Rule 7 calculations of the overall percentages of the ultimate distribution of the marital estate closely mirrored the amounts established by the trial court in its final judgment. According to these calculations, the award of the Mustang to Husband rather than to Wife would result in net marital assets awarded to Wife in the amount of $97,414.00 and net marital assets awarded to Husband in the amount of $78,945.31. The relative distribution of the marital estate then becomes 55.2% to Wife and 44.8% to Husband. We determine this modification to the trial court's judgment to be necessary to equitably distribute the marital estate of this relatively short-term marriage. We therefore remand for the trial court to modify the judgment by awarding the 1969 Ford Mustang Convertible to Husband.

In addition, we determine another modification to the trial court's judgment as necessary due to the passage of time involved in the appellate process. The trial court included in its final judgment a directive that Wife was required to refinance the debt associated with the Marital Residence in her name by one year following the beginning of trial. This provision of the judgment states:

> The marital residence located at 2993 Benton Pike shall be awarded to Wife at $265,000 subject to the first mortgage indebtedness owed to Athens Federal Bank and the secured second mortgage and/or home equity line of credit owed to Andrew Johnson Bank and with regard to which Wife shall indemnify and hold Husband harmless. Husband is awarded no equity interest in said property. Furthermore, Wife shall refinance the referenced

first mortgage and HELOC so as to clear Husband's name from said indebtedness <u>within one year of August 21, 2014</u>. In the event Wife does not refinance said indebtedness, the residence shall be awarded to Husband; however, at that time Husband shall be required to pay to Wife $52,000.00 for her equity interest in the property and at the same time Husband will then assume the first and second mortgage indebtedness, thereafter indemnifying and holding Wife harmless.

(Emphasis added.) We direct that on remand, the trial court modify the judgment to change the deadline for Wife to refinance the debts associated with the Marital Residence from August 21, 2015, to one year following issuance of this Court's mandate subsequent to the filing of this decision and subject to stay pursuant to Tennessee Rule of Appellate Procedure 42.

Upon our careful and thorough review of the record, we conclude that with the addition of the two modifications delineated above, a preponderance of the evidence otherwise supports the trial court's equitable distribution of the marital estate.

## V. Post-Judgment Facts

Husband has filed a motion, pursuant to Tennessee Rule of Appellate Procedure 14, asking this Court to consider certain post-judgment facts regarding payment of the debts associated with the Marital Residence and the zero-turn lawn mower during the pendency of this appeal. Wife has responded by filing a response objecting to this motion. Upon consideration of the motion and response, we determine that these facts do not affect the positions of the parties or the subject matter of the action, particularly considering our modification of the judgment to afford Wife additional time to refinance the debts associated with the Marital Residence following the completion of the appellate process. We therefore deny consideration of these post-judgment facts. See Tenn. R. App. P. 14 (a); *see, e.g., Town of Dandridge v. Patterson*, 827 S.W.2d 797, 802 (Tenn. Ct. App. 1991).

## VI. Conclusion

For the reasons stated above, we modify the trial court's judgment to (1) award the 1969 Ford Mustang Convertible, valued at $10,000.00, to Husband rather than Wife and (2) extend the deadline for Wife's refinancing of the debts associated with the Marital Residence to one year following issuance of this Court's mandate subsequent to the filing of this decision and subject to stay pursuant to Tennessee Rule of Appellate Procedure 42. We affirm the trial court's judgment in all other respects. This case is remanded to the trial court for modification and enforcement of the judgment, as well as collection of

23

costs below.  Costs on appeal are taxed one-half to the appellant, Randall Lynn Howard, and one-half to the appellee, Sharon Lynnette Howard.

_____
THOMAS R. FRIERSON, II, JUDGE